# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KEVIN COOK AND NICHOLE COOK | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0522-SG |
| | ) | |
| DEEP HOLE CREEK ASSOCIATES, a | ) | |
| Delaware partnership, DEEP HOLE | ) | |
| CREEK ASSOCIATES, INC., a | ) | |
| Delaware corporation, LAURENCE L. | ) | |
| BURKE and SUZANNE T. WATKINS, | ) | |
| Co-Trustees of the LAYTON FAMILY | ) | |
| TRUST, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  April 22, 2024
Date Decided:  July 24, 2024

Richard E. Berl, Jr., HUDSON, JONES, JAYWORK & FISHER, LLC, Lewes, Delaware, *Attorney for Plaintiffs*.

John W. Paradee and Brian V. DeMott, BAIRD MANDALAS BROCKSTEDT & FEDERICO, LLC, Dover, Delaware, *Attorneys for Defendants*.

**GLASSCOCK, Vice Chancellor**

Deep Hole Creek is a rather modest name for a waterway that once carried the channels of both the Broadkill River and Lewes Creek, now part of the Lewes-Rehoboth Canal. That was in the days when the confluence of those two waterways forced natural and shifting inlets into the Delaware Bay, between Lewes and Broadkill Beach, before the Federal Government stabilized a permanent inlet, Roosevelt Inlet, just northwest of Lewes, in the late 1930s.

Broadkill Sound, by contrast, is a particularly grandiose name for a tidal slough[1] a few yards wide, which drains the marsh behind Broadkill Beach.

These are two names for the same waterway. I will follow the parties and the title documents, and refer here to "Deep Hole Creek" (the "Creek"). This matter concerns a property adjacent to the Creek, just above where it discharges into the Broadkill River. The dispute concerns the boundaries of Plaintiffs' real property, and whether it is bounded on the west by a property line near but not reaching the Creek, or whether it encompasses the Creek bottom, to the centerline. At stake is Plaintiffs' right to access Deep Hole Creek, and to wharf out to the waterway.

Plaintiffs are the owners of the lot in question; Defendants are grantors to Plaintiffs' predecessor in title. Defendants comprise a number of entities and individuals; for simplicity's sake I will refer to them as the "Burke Family." Several

---

[1] Not to be confused with *the* Broadkill Slough, which is a submerged feature in Delaware Bay, uptide of Broadkill Beach.

decades ago, the Burke Family subdivided a several-acre property fronting on Deep Hole Creek. The property, by deed, extended to the centerline of the Creek. The Burke Family's intention was to retain an area between the upland and the centerline of the Creek, which they saw as reserving to them a valuable asset, allowing them to sell access to the water to the buyers of the adjacent lots. What became Plaintiffs' parcel, Revised Lot 1, was originally no exception. However, to settle a legal action in the 1990s, the Burke Family was forced to further subdivide original Lot 1, into new Lots 1 and 1-A, the latter of which contained a common-use boat ramp. The resulting Revised Lot 1, net of new Lot 1-A, would have been too small to be buildable under then-exiting County regulations. Accordingly, Revised Lot 1 was enhanced by including some of the waterfront and Creek bottom property the Burke Family had previously retained; the resulting Revised Lot 1 was defined by a plot plan that include lands out to the western boundary of the original large parcel within the bounds of Lot 1. This nearly doubled the size of the resulting Revised Lot 1, to about one acre. This addition of lands to Lot 1 was in the interest of its then-owners, the Burke Family, as the revised, enhanced Lot 1 would be buildable, and thus valuable. This was the lot the Burke Family deeded out, and which is now owned by Plaintiffs.

The Burke Family argues that the sidelines called in the deed to Lot 1—even as enhanced—are not of sufficient length to carry to the centerline of Deep Hole

Creek. They argue that they still maintain property rights in strip along or under the Creek and thus control access from Revised Lot 1 to the Creek. Looking at the deed out, the foundational deeds, the surveys, and considering other parts of the record, I find that Revised Lot 1, as enhanced and transferred out to a buyer, was intended by the Burke Family to carry to the centerline of Deep Hole Creek; that the original buyers took the property to that natural monument; and that such is what Plaintiffs purchased.

Plaintiffs wish to build a dock into Deep Hole Creek. The Burke Family disputes their right to do so, and Plaintiffs seek to quiet title that their property is riparian and that they have a right to wharf out, unimpeded by the Burke Family. The parties have cross-moved for summary judgment. I find that the Burke Family did not retain a strip between Revised Lot 1 and the centerline of Deep Hole Creek, and that Plaintiffs own to the centerline. Accordingly, Plaintiffs are entitled to quiet title to the Creek centerline, and summary judgment must be granted accordingly. My reasoning is below.

# I. BACKGROUND

*A. Factual Background*[2]

## 1. A Brief History of the Property

The property at issue traces back to a 1957 deed to Halsted P. Layton and Jennie H.J. Layton, in Deed Book 494, Page 241.[3] The deed describes a parcel of roughly 5.8 acres. In 1985, Jennie H.J. Layton transferred the property to her great-grandchildren, Merritt Burke IV, Laurence Layton Burke, Thompson Absury Burke, Christopher Meade Burke, Archibald Watkins, and Elisabeth Blair Watkins.[4] That deed included a plot prepared by McCann Inc. and bearing the date "June 1985" (the "1985 Deed").[5] The June 1985 plot shows uplands bounded on the west[6] by Deep Hole Creek; a staggered line is shown in Deep Hole Creek but is undefined on the plot.[7] The transfer included roughly 4.5 acres of the original 5.8 acres recorded in the 1957 deed.[8]

Included in the 1985 Deed is a survey that shows the beginning point along Bayshore Drive and a corner of Lot 46, what is formerly known as Old Inlet Beach

---

[2] This Memorandum Opinion only contains facts necessary to my analysis.

[3] Stipulation and Order, Ex. A—Compendium of Exs of Laurence Burke Depo. Tr. with Exs. (PART 1) at A-00204–07, Dkt. No. 36 ("L.B. Exs. Pt. 1").

[4] *Id.* at A-00034–35, A-00211–14.

[5] *Id.* at A-00211–14.

[6] I use the cardinal directions, north, south, east, and west, loosely; the properties are not aligned so precisely. The east side is generally toward the Delaware Bay and the west toward Deep Hole Creek.

[7] *See* L.B. Exs. Pt. 1 at A-00211–14.

[8] *Compare id., with* L.B. Exs. Pt. 1 at A-00204–07.

Section 3.[9]  The description of the 4.5 acres follows Lot 46 for 234 feet and then continues as follows:

> thence continuing with the same bearing by and with these lands, Lot 46 and the other lands now or formerly of Jennie H.J. Layton 58 feet, more or less (in all making total distance of 292 feet, more or less) to a point, said point being a corner for these lands, a corner for the lands now or formerly of Jennie H.J. Layton and being located at the centerline of the Deep Hole Creek; thence by and with these lands and (2) the meanderings of the centerline of the Deep Hole Creek in a southerly direction to a point, said point being located at the intersection of the centerline of the Deep Hole Creek and the centerline of the Broadkill River extended . . . .[10]

In August 1996, the great-grandchildren transferred the property to a then newly-formed partnership called Deep Hole Creek Associates.[11]  In the mid-1990s, the partnership retained McMann, Inc. to subdivide the 4.5 acres.  The resulting subdivision plot was recorded on February 20, 1997 (the "1997 Plot") and consisted of four new lots, three along Deep Hole Creek and one on the Delaware Bay.[12]  The 1997 Plot also established a fifty-foot right of way to connect Bayshore Drive to lands owned by Lewes, Delaware, and another fifty-foot private easement from

---

[9] L.B. Exs. Pt. 1 at A-00213.

[10] *Id.* at A-00211.

[11] *See id.* at A-00013–14; A-00048; A-00215–18.  This partnership "transitioned" into a corporation, Deep Hole Creek Associates, Inc., the shareholders of which are the same as the partners in the partnership. *Id.* at A-00017–18.

[12] *See* Stipulation and Order, Ex. A—Compendium of Exs of Laurence Burke Depo. Tr. with Exs. (PART 2) at A-00246, Dkt. No. 36 ("L.B. Exs. Pt. 2").  While the parties disagree regarding the appropriate dates to include in the abbreviations, throughout this Memorandum Opinion, I will refer to the survey that depicts original Lot 1 as the "1997 Plot" and the survey that depicts Revised Lot 1 as the "1998 Plot."

5

Bayshore Drive to Deep Hole Creek.[13] At issue is Lot 1 of this subdivision, the northernmost of the Creek-side lots.

Between the creation of the lots and October 2015, neither the current Defendants nor any of their predecessors in interest had ever conveyed out a lot on Broadkill Beach that included a conveyance of the family's ownership interest in the waters of Deep Hole Creek.[14] Instead, if a purchaser of a lot wanted to acquire a right of access to the waters of Deep Hole Creek, the Burke Family typically would, for additional consideration, grant the purchaser an easement to construct a dock extending into Deep Hole Creek.[15]

### 2. The Beauregard Suit

In June 1997, Raymond and Dorothy Beauregard filed suit against Deep Hole Creek Associates (the "Beauregard Suit"), alleging that when the Beauregards were looking to purchase a lot, Jenni H. J. Layton represented that the boat ramp on what later became Lot 1 (within the 4.5 acres) would be available to lot owners in that subdivision. In reliance on that representation, the Beauregards purchased Lot 37 in 1971. However, Deep Hole Creek Associates blocked access to the boat ramp, triggering the action.[16] Ultimately, the parties reached a tentative settlement that

---

[13] *See id.*
[14] *See* L.B. Exs. Pt. 1 at A-00057–58, A-00084–85, A-00130.
[15] *See id.* at A-00057–58.
[16] L.B. Exs. Pt. 2 at A-00255–81.

6

required moving the existing boat ramp, then part of Lot 1, to the forty-foot easement area on the 1997 Plot.[17]   This tentative settlement, however, was contingent on DNREC approval.[18]   DNREC withheld approval to move the boat ramp unless the new ramp complied with then-existing marina regulations.[19]   Deep Hole Creek Associates decided against moving the boat ramp; instead, it agreed to re-subdivide Lot 1 to carve out a separate parcel ("Lot 1-A") to be deeded to an owners' association.[20]

Deep Hole Creek Associates retained McMann, Inc., again to prepare the plot to revise Lot 1 (the "1998 Plot").[21]   The 1998 Plot created Lot 1-A, which was designated as a "Non-Buildable Outlot," including the previously-built boat ramp into Deep Hole Creek.[22]   Prior to the revision, Lot 1 had comprised 27,200 square feet.[23]   Once Lot 1-A was separated from original Lot 1, obviously, the remainder available for Lot 1 was reduced.   In the 1998 Plot, however, the revised Lot 1 ("Revised Lot 1") was *enlarged* to one acre, because Sussex County regulations required a newly-created lot to be a minimum of one acre if it ran across the water.[24]

---

[17] *See id.* at A-00268–69.
[18] *See id.* at A-00270.
[19] *See id.* at A-00278–79.
[20] *See id.* at A-00278–81.
[21] *See id.* at A-00247.
[22] *See id.*
[23] L.B. Exs. Pt. 1 at A-00106.
[24] *Id.* at A-00107.   An acre is a unit of measurement equal to 43,560 square feet.  *Acre*, MERRIAM WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/acre (last visited May 15, 2024).

In the 1998 Plot, the road frontage of Revised Lot 1 was reduced from 155 feet to 111.06 feet,[25] but the lot was enlarged to one acre by adding lands to the west that Defendants had previously retained when creating the subdivision.

### 3. Deep Hole Creek Partnership Sells Revised Lot 1

In September 1998, Deep Hole Creek Partnership sold Revised Lot 1 to Edward Joseph Hillings and Yvonne F. Hillings.[26] The description of Revised Lot 1 included in the deed to the Hillings (the "1998 Deed") referred to the 1997 Plot "as revised and superceded [sic]" by the 1998 Plot "and said to contain 1 acre of land, be the same more or less[.]"[27]

### 4. The Cooks Purchase Revised Lot 1

In the fall of 2019, Plaintiffs, the Cooks, began their search for a lot to purchase in Broadkill Beach.[28] On October 15, 2019, Kevin[29] found a posting on a real estate website indicating that Revised Lot 1 was for sale. Kevin contacted his real estate agent to inquire about the property and placed an offer on Revised Lot 1 that afternoon.[30] The Hillings accepted Plaintiffs' offer and a contract was signed

---

[25] *Compare* L.B. Exs. Pt. 2 at A-00246, *with* L.B. Exs. Pt. 2 at A-00247.
[26] L.B. Exs. Pt. 1 at A-00219–20.
[27] *Id.* at A-00219.
[28] Ex. A Continued – Compendium of Exs. of Kevin Cook Depo. Tr. with Exs. (Part 1) at A-00292–93, Dkt. No. 37 ("K.C. Exs. Pt. 1").
[29] I use Plaintiffs' first names for clarity, not from any personal familiarity with the individuals. No disrespect is meant.
[30] K.C. Exs. Pt. 1 at A-00292–93.

the following day.[31]  Prior to closing, the Cooks retained Cotten Engineering to survey the property (the "Cotten Survey").[32]  Cotten completed its survey on November 1, 2019.[33]

A few days later, Kevin emailed Cotton Engineering to request that a "stake and pink flag [be placed] in the Northwest corner of the lot" so that Kevin could "determine where and how much room I have for the start of a dock."[34]  In response, Cotten Engineering sent Kevin two deeds and two plot plans, regarding the history of Lot 1, which Cotten Engineering used in determining the boundary of Revised Lot 1.[35]  The first deed was the last in the chain of title, which transferred Revised Lot 1 from Deep Creek Hole Partnership to the Hillings in 1998 (the "1998 Deed").[36] The second deed attached was the next in the chain of title, the 1996 deed transferring ownership of Lot 1 to Deep Creek Hole Partnership, describing Lot 1 prior to the subdivision that created Lot 1-A.[37]  Cotten Engineering also attached the 1997 Plot for Lot 1 prior to the subdivision, and 1998 Plot for the Revised Lot 1, after the subdivision.[38]

---

[31] *Id.* at A-00309; Ex. A Continued – Compendium of Exs. of Kevin Cook Depo. Tr. with Exs. (Part 2) at A-00450–62, Dkt. No. 37 ("K.C. Exs. Pt. 2").

[32] L.B. Exs. Pt. 1 at A-00221–23.

[33] *See* K.C. Exs. Pt. 2 at A-00430.

[34] Ex. A Continued – Compendium of Exs. of Cory Darden Depo. Tr. with Exs. (Part 2) at A-00845–46, Dkt. No. 37.

[35] *See* K.C. Exs. Pt. 1 at A-00419–28.

[36] *Id.* at A-00425–26.

[37] *Id.* at A-00421–24.

[38] *See id.* at A-00427–28.

Cotten Engineering's representative explained that these four documents, when read together, indicate that the northern boundary of Revised Lot 1 extends to the centerline of Deep Hole Creek; therefore the western boundary of Revised Lot 1 follows the meanderings of the centerline of the centerline of Deep Hole Creek.[39] Based on this conclusion, Cotten Engineering sent a revised metes and bounds legal description for Revised Lot 1 to Kevin on December 6, 2019, to insert "of the centerline" into the description of the western boundary.[40] Thus, the legal description written by Cotton Engineering describes the western boundary of Revised Lot 1 as "running in a northwesterly direction with the meanderings of the centerline of said creek . . . ."[41] This legal description and the corresponding Cotten Survey were recorded as part of the Cook's deed to Revised Lot 1 on December 7, 2019.[42]

### 5. The Cooks Attempt to Construct a Dock on Deep Hole Creek

In early 2020, shortly after closing on their purchase of Revised Lot 1, the Cooks filed an application with the DNREC to construct a dock extending from the westerly uplands of Revised Lot 1 and into the waters of Deep Hole Creek.[43] Defendants objected to this application on the basis that, as proposed, the dock

---

[39] K.C. Exs. Pt. 1 at A-00420.
[40] *Id.* at A-00335–36.
[41] K.C. Exs. Pt. 2 at A-00434.
[42] *See* L.B. Exs. Pt. 1 at A-00221–23.
[43] *See* K.C. Exs. Pt. 1 at A-00399–400.

would extend over and across property Defendants believed to be owned by DHCA Partnership, namely the bed of Deep Hole Creek.[44]

*B. Procedural History*

On September 1, 2020, Plaintiffs commenced this action by filing a complaint to redress a slander of title in the Superior Court of the State of Delaware.[45] After the Superior Court determined it did not have subject matter jurisdiction over the matter on April 21, 2021, Plaintiffs duly transferred the action to the Court of Chancery by filing a complaint for quiet title on June 15, 2021.[46] The parties conducted discovery, after which both sides moved for summary judgment.[47] Briefing on the cross-motions for summary judgment concluded on October 2, 2023,[48] and I heard oral argument on the motions on April 22, 2024.[49] I consider the matter submitted as of that date.

## II. ANALYSIS

*A. Standard of Review*

Under Court of Chancery Rule 56(c), summary judgment may be entered if the record "show[s] that there is no genuine issue as to any material fact and that the

---

[44] K.C. Exs. Pt. 1 at A-00401–13; K.C. Exs. Pt. 2 at A-00447–48.
[45] Transfer Order, Dkt. No. 1.
[46] Transfer Order; *see* Verified Compl. to Quiet Title, Dkt. No. 1.
[47] Defs.' Mot. for Summ. J., Dkt. No. 44; Pls.' Mot. for Summ. J., Dkt. No. 46.
[48] *See* Defs.' Answering Br. Opp'n Pls.' Mot. for Summ. J., Dkt. No. 52.
[49] *See* Judicial Action Form re Mot. for Summ. before Vice Chancellor Sam Glasscock dated 4.22.24, Dkt. No. 57.

11

moving party is entitled to a judgment as a matter of law."[50]  To determine whether summary judgment should be granted, "the Court must view the evidence in the light most favorable to the non-moving party."[51]  Where, such as here, the Court is presented with cross-motions for summary judgment on a stipulated record for the Court's adjudication, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the records."[52]

*B. Interpreting the Northern and Western Boundaries of Revised Lot 1*

Plaintiffs request that this Court find that Revised Lot 1, as purchased by the Plaintiffs, extends to the centerline of Deep Hole Creek and, thus, Plaintiffs own to the centerline of Deep Hole Creek.  Defendants dispute Plaintiffs' asserted ownership over any portion of the bed of Deep Hole Creek, let alone to the centerline of Deep Hole Creek, primarily on the basis that Defendants did not convey their ownership interest in the bed to the Hillings in the 1998 Deed so the Hillings could not convey ownership they lacked.

"The construction of a deed is a question of law."[53]  As with all contracts, deeds are reviewed by the Court to establish the parties' intent as set out within the

[50] Ct. Ch. R. 56(c).
[51] *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014) (quoting *Merrill v. Crothall-Am., Inc.*, 606 A.2d 69, 99 (Del. 1992)).
[52] Ct. Ch. R. 56(h).
[53] *Smith v. Smith*, 622 A.2d 642, 645 (Del. 1993).

deed.[54]    The Court's "guiding principle in interpreting the language used in a conveyance is to determine, as closely as possible, the grantor's intent."[55]   To aide in determining the grantor's intent, the Court uses a "priority of calls," that requires the Court "to consider various identifying factors: calls to natural monuments take the first priority, then to artificial monuments, then to courses of distances, then to acreage."[56]   This priority of calls is a rule of construction that ranks in order certain factors when a deed may otherwise be unclear.  Where a deed makes a call to a natural monument, that call will take first priority.   Calls to artificial monuments take second priority.  Next, calls to courses of distances take third priority.  The lowest priority falls to calls to acreage.

If a conveyance is ambiguous, "the intention of the parties to the transaction is paramount but certain 'presumptions of intention' may serve to resolve doubt.'"[57] One such presumption of intention that is relevant to the instant action is that "absent language in a deed to the contrary, a grantor is presumed to intend to convey the largest bundle of rights he or she possesses."[58]

---

[54] *See id.* at 646 (explaining that "[t]he fundamental rule in construing a deed is to ascertain and give effect to the intent of the parties as reflected in the language they selected.").

[55] *State v. Sweetwater Point, LLC*, 2017 WL 2257377, at *8 (Del. Ch. May 23, 2017) (citing *Smith*, 622 A.2d at 646).

[56] *Id.* at *8.

[57] *Smith*, 622 A.2d at 646 (citation omitted).

[58] *Id.*

13

## 1. What Property was Conveyed to Defendants?

The parties do not dispute that, prior to the 1998 conveyance to the Hillings, Defendants and their predecessors in interest owned title to the lands running to the centerline of Deep Hole Creek. Regarding that conveyance, I find that it is necessary to conduct a review of the 1985 transfer of the lands from Layton to her great-grandchildren; this bears on my determination of what Defendants intended to convey to the Hillings. Thus, before I can determine the boundaries of the parcel that Defendants conveyed to the Hillings, who then conveyed the same parcel to Plaintiffs, I must address the boundaries of the parcel conveyed from Layton to Defendants to determine the outer boundaries of what Defendants had authority to convey to others.

The 1985 Deed, which effectuated Layton's transfer of 4.5 acres of her land to her great-grandchildren, describes the northern and western boundaries of the parcel conveyed by making a call to a natural monument, namely the centerline of Deep Hole Creek.[59] Specifically, the 1985 Deed describes the northern boundary as starting in the east at Bayshore Drive before going westward

> 234.0 feet to an iron pipe, said iron pipe being located on the line of these lands and on the line of Lot 46; thence continuing with the same bearing by and with these lands, Lot 46 and the other lands now or formerly of Jennie H.J. Layton 58 feet, more or less (in all making total distance of 292 feet, more or less) to a point, said point being a corner

---

[59] *See* L.B. Exs. Pt. 1 at A-00211.

14

for these lands, a corner for the lands now or formerly of Jennie H.J. Layton and being located in the centerline of the Deep Hope Creek[.][60]

With respect to the western boundary, the 1985 Deed states that it follows

the meanderings of the centerline of the Deep Hole Creek in a southerly direction to a point, said point being located at the intersection of the centerline of the Deep Hole Creek and the centerline of the Broadkill River extended, being a corner for these lands and being located on the line of the lands now or formerly of the City of Lewes[.][61]

While the 1985 Deed describes the northern boundary of the parcel in terms of distance, the northern boundary also makes a call to a natural monument: the centerline of the Deep Hole Creek.[62] Because the first priority of calls is a call to a natural monument, the priority of calls confirms that Layton's intention in executing the 1985 Deed was to convey her title to the land to reach the centerline of the Deep Hole Creek. This interpretation is further confirmed by the description of the western boundary in the 1985 Deed, which states that the western boundary follows "the meanderings of the centerline of the Deep Hole Creek . . . ."[63]

When the 1985 Deed was recorded, a survey prepared by McCann, Inc. of the property conveyed from Layton to her great-grandchildren was also recorded (the "1985 Plot"). That visual depiction of the parcel received by Defendants is shown

---

[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*

15

below.[64]  The 1985 Plot shows the entirety of the 4.5 acres transferred to Defendants, as described in the 1985 Deed.  Notably, the 1985 Plot depicts the northern boundary of the parcel as running west from Bayshore Drive for a distance of 292 feet to a point "located at the centerline of the Deep Hole Creek."[65]  While the 1985 Plot lacks a legend, when read in conjunction with the 1985 Deed, the 1985 Plot clearly indicates that the dotted-and-dashed line representing the western boundary is the centerline of Deep Hole Creek.[66]

---

[64] *Id.* at A-00213.
[65] *Id.* at A-00211, A-00213.
[66] *Compare* L.B. Exs. Pt. 1 at A-00211, *with* L.B. Exs. Pt. 1 at A-00213.

16



## 2. What Property was Conveyed from Defendants to the Hillings

Next, I must decide the boundaries of the parcel of land that the Hillings purchased from Defendants to determine what the Hillings had authority to convey to Plaintiffs when Plaintiffs purchased Revised Lot 1 in 2019. The 1998 Deed that conveyed Revised Lot 1 to the Hillings does not provide a metes and bounds description of the land.[67] Rather, the 1998 Deed conveys Revised Lot 1 as described

---

[67] *See* L.B. Exs. Pt. 1 at A-00219.

17

in the 1997 Plot prepared by McCann, Inc. "as revised and superceded [sic]" by the 1998 Plot, also prepared by McCann, Inc., "and said to contain 1 acre of land[.]"[68]

The 1997 Plot, depicted below, shows the eastern border of Lot 1 as running along Bayshore Drive for 155 feet and the northern border running west for 255 feet before terminating at a point that intersects with a light-grey shaded area labeled "Other Lands of Jennie H.J. Layton Et Al."[69] This light-grey shaded area is also labeled as Deep Hole Creek.[70] The light-grey shaded area is separated from a darker shaded area by a dotted-and-dashed line that continues the length of Deep Hole Creek, south to where the Creek empties into the Broadkill River.[71] The 1997 Plot does not include a legend to explain what either the light-grey shaded area or the darker shaded area are intended to depict, nor does the 1997 Plot explain what the dotted-and-dashed line separating those areas is meant to denote.[72] Presumably, because the length of the northern boundary of Lot 1 is only 255 feet, while the deed-in from Layton called that boundary at 292 feet, I may presume the Defendants meant to reserve from original Lot 1 a strip along the Creek and Creek bed.

---

[68] *Id.*
[69] L.B. Exs. Pt. 2 at A-00246.
[70] *Id.*
[71] *Id.*
[72] *Id.*

18



As noted in the 1998 Deed, the 1997 Plot was revised and superseded by the 1998 Plot, which was prepared to settle the Beauregard Suit.[73] While the northern border of Lot 1 in the 1997 Plot runs 255 feet west from Bayshore Drive, the northern border of Revised Lot 1 in the 1998 Plot runs 292 feet west from Bayshore Drive.[74] Notably, the call for the northern boundary to run 292 feet west from Bayshore Drive is *the same call* that was used in the 1985 Deed and the 1985 Plot, which transferred

---

[73] *See supra* Section I.A.2.
[74] *Compare* L.B. Exs. Pt. 2 at A-00246, *with* L.B. Exs. Pt. 2 at A-00247.

ownership to the centerline of the Deep Hole Creek to Defendants.[75] The northern border is depicted as extending into the light-grey shaded area labeled "Deep Hole Creek" and reaches a dashed line separating the light-grey shaded area from a darker shaded area.[76]

Unlike the portion of the light-grey shaded area abutting the western boundary of Lot 1 in the 1997 Plot that is labeled both as "Deep Hole Creek" and "Other Lands of Jennie H.J. Layton Et Al.," Revised Lot 1 is depicted as including a portion of Deep Hole Creek with the label "Other Lands of Jennie H.J. Layton Et Al." affixed to the light-grey shaded area abutting the *southern* boundary of Revised Lot 1.[77] While the 1997 Plot described the eastern boundary of Lot 1 as running parallel to Bayshore Drive for 155 feet, the eastern boundary of Revised Lot 1 is shortened in the 1998 Plot to only run parallel to Bayshore Drive for 111.06 feet (to allow for the creation of Lot 1-A).[78] Lastly, the 1997 Plot had previously indicated that Lot 1 was 27,200 square feet in area, but the 1998 Plot denotes that the area of Revised Lot 1 is now an acre, more or less; that is, roughly 44,000 square feet.[79]

---

[75] *Compare* L.B. Exs. Pt. 2 at A-00247, *with* L.B. Exs. Pt. 2 at A-00211, A-00213.
[76] L.B. Exs. Pt. 2 at A-00247.
[77] *Compare* L.B. Exs. Pt. 2 at A-00246, *with* L.B. Exs. Pt. 2 at A-00247.
[78] *Compare* L.B. Exs. Pt. 2 at A-00246, *with* L.B. Exs. Pt. 2 at A-00247.
[79] *Compare* L.B. Exs. Pt. 2 at A-00246, *with* L.B. Exs. Pt. 2 at A-00247.



The parties do not dispute that the eastern and southern boundaries of Revised Lot 1 are defined as running along Bayshore Drive and as the boundary between it and Lot 1-A, respectively. At issue are the northern and western boundaries of Revised Lot 1. With respect to the northern boundary, the parties dispute whether the call describing the length of the northern boundary of Revised Lot 1 reaches the centerline of Deep Hole Creek or if it falls short, such that the northern boundary instead terminates at exactly 292 feet west of Bayshore Drive, whether that is on dry land, in the marsh, or somewhere within the waters of Deep Hole Creek.[80] The western boundary is informed by where the northern boundary terminates.

---

[80] Defs.' Opening Br. Supp. Mot. for Summ. J. 54, Dkt. No. 44 ("Defs.' OB").

21

While the 1997 Plot that initially subdivided the 4.5 acres established the northern boundary of Lot 1 as running 255 feet west from Bayshore Drive, presumably as to not include any portion of Deep Hole Creek, the 1998 Plot revised the northern boundary of Lot 1 as running 292 feet west from Bayshore Drive.[81] That 292 feet is the same description used in the 1985 Deed and 1985 Plot, which is defined as making a call to a natural monument: a point on the centerline of Deep Hole Creek.[82] This indicates that the northern boundary of Revised Lot 1 reverted to the northern boundary described in the 1985 Deed and 1985 Plot.

Defendants contend that the call to a course of distance used in the 1998 Plot falls short of the Creek, reaching only a point in the upland.[83] However, this understanding would indicate that the 1985 Deed, which Layton used to convey the lands to the Burke Family, did not convey to the centerline but only to a point in the upland. The first-in-priority call to the natural monument and the doctrine that a grantor is presumed to convey all that she owns trumps Defendants' interpretation of the 1998 Plot. Presumably, the reason that the 1985 Deed contains calls to both the Creek as a natural monument and a course of distance of 234 feet to "a pipe," thence on the same bearing a total of 292 feet "more or less," is because the point at the intersection of the western and northern boundaries was across marsh and the

---

[81] *Compare* L.B. Exs. Pt. 2 at A-00246, *with* L.B. Exs. Pt. 2 at A-00247.
[82] *Compare* L.B. Exs. Pt. 2 at A-00247, *with* L.B. Exs. Pt. 1 at A-00211, A-00213.
[83] *See* Defs.' OB 51–55.

water of the Creek, and did not lend itself to an accurate survey, let alone the setting of an artificial monument. The northern boundary was set out in the 1985 Deed and listed an estimated distance as reaching the centerline of the Creek. While that estimated distance in the 1985 Deed may have been inaccurate, the doctrine that a grantor is presumed to convey all that she owns vested Defendants with title to the centerline in 1985, which is undisputed by the parties. Thus, the northern boundary of Revised Lot 1, set out in the 1998 Plot, likewise reaches the centerline of Deep Hole Creek.

Since the northern border terminates to the west at a point on the centerline of Deep Hole Creek, I must next determine the western boundary of Revised Lot 1. Neither the 1998 Plot nor the 1997 Plot, which the 1998 Plot revised, provide a metes and bounds description of the western boundary of Revised Lot 1.[84] The lack of a metes and bounds description indicates that the western boundary of Revised Lot 1 traces a natural monument. This indication is confirmed when the 1998 Plot is compared to the 1985 Plot, which is accompanied by a metes and bounds description in the 1985 Deed. The 1998 Plot depicts a bolded border to delineate the boundaries of Revised Lot 1 and Lot 1-A.[85] When compared against the 1985 Plot, the bolded

---

[84] *See* L.B. Exs. Pt. 2 at A-00246–47. The 1997 Plot shows Lot 1 bounded to the west by an irregular line, which I presume (but need not decide) follows another natural monument, the boundary between upland and marsh. That same line is shown on the 1998 Plot, but it is *within* the boundaries of Revised Lot 1. This bolsters my conclusion here that Revised Lot 1 runs to the centerline of the Creek.

[85] *See id.* at A-00247.

border representing the western boundary in the 1998 Plot lies along the same western boundary depicted in the 1985 Plot.[86] The 1985 Plot is accompanied by the 1985 Deed that explains that the western boundary of Lot 1 follows "the meanderings of the centerline of the Deep Hole Creek in a southerly direction . . . ."[87] Therefore, I conclude that the western boundary of Revised Lot 1 must follow the centerline of Deep Hole Creek, as described in the 1985 Deed. The 1998 Plot confirms that a natural monument is the western bound of the property—it does not simply close the western boundary with a straight line, instead, it follows a meander line to close the plot.

The grantor's intention to grant ownership over the bed of Deep Hole Creek adjacent to Revised Lot 1 is further confirmed when the size of the property that Defendants intended to convey is taken into consideration. To be a buildable lot, Revised Lot 1 was required to be at least one acre in size, which Defendants acknowledge.[88] Prior to the 1998 revision of Lot 1, Lot 1 was 27,200 square feet, less than the necessary 43,560 square feet, or one acre, to be deemed a buildable lot.[89] The revision caused Lot 1-A to be carved out of Lot 1, thereby diminishing

---

[86] *Compare* L.B. Exs. Pt. 2 at A-00247, *with* L.B. Exs. Pt. 1 at A-00213.
[87] L.B. Exs. Pt. 1 at A-00211.
[88] *See id.* at A-00107.
[89] *See id.* at A-00106.

Lot 1 in size *unless* the northern and western boundaries were extended to the fullest extent of the Defendants' property rights.

To recapitulate: the Burke Family relied on the assertion that the call on the northern boundary—292 feet—falls short of Deep Hole Creek as it exists today; ergo, they retained lands along the Creek to the west of that call. Grantors, I note, are presumed to convey all they have. However, this initial presumption is rebutted here; Defendants have a history of retaining water rights by reserving a strip along the waterfront when transferring property to buyers. This intent presumably was represented by the plot of *initial* Lot 1, which reduced the east-west property lines from that provided in the deed-in from Layton, which had been called to the meander line of the Creek. Things changed with the settlement of the Beauregard Suit and the creation of Lot 1-A from the initial Lot 1. As a result, to make Revised Lot 1 valuable, Defendants were required to transfer their ownership to the centerline of Deep Hole Creek to the Hillings in 1998 so that Revised Lot 1 would be considered a buildable lot. The deed-out to the Hillings relied on the 1998 Plot, in which the northern boundary is shown as reverting to the dimensions of the Layton deed-in, and which used a meander line as the western boundary. Regardless of the fact that the number of feet called in *both* the deed-in from Layton *and* the deed-out to the Hillings appears to fall short of the Creek, the intent of the Burke Family, I find, was clear. They wished to convey all they had in the footprint of the Revised Lot 1 in

25

order to fashion a buildable lot, and accomplished this by using the Creek centerline as the western bound. Given these facts, the supremacy of a natural monument (the meander line) over a call of distance, and the lack of any indication that Defendants reserved the right to subaqueous land, I find that the presumption that a seller intends to convey all that he has applicable to *Revised* Lot 1, which is the land Plaintiffs acquired from the Hillings. Accordingly, Plaintiffs are granted quiet title to the bed of Deep Hole Creek adjacent to Revised Lot 1, as shown in the 1998 Plot.

## III. CONCLUSION

Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion for summary is DENIED. The parties should submit a form of order in accordance with this Memorandum Opinion.

26